# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH ROMAIN, HERMAN JIMINIAN, JEANETTE FELICIANO, ALBIN DUCLET, and MARIA MOREIRA, and On Behalf of The COBA ANNUITY FUND and the COBA GENERAL FUND,<br><br>Plaintiffs,<br><br>v.<br><br>NORMAN SEABROOK, ELIAS HUSAMUDEEN, JOSEPH BRACCO, ELIZABETH CASTRO, MICHAEL MAIELLO, AMELIA WARNER, THOMAS FARRELL, KAREN TYSON, BENNY BOSCIO, KENYATTA JOHNSON, ALBERT CRAIG, DANIEL PALMEIRI, ANGEL CASTRO, FREDERIC FUSCO, PAULETTE BERNARD, PLATINUM MANAGEMENT (NY) LLC, MURRAY HUBERFELD, DAVID BODNER, MARK NORDLICHT, JONA RECHNITZ, JEREMY REICHBERG, KOEHLER & ISAACS, LLP, BUCHBINDER TUNICK & COMPANY, DANIEL H. COOK AND ASSOCIATES, and STERLING VALUATION GROUP,<br><br>Defendants,<br><br>and<br><br>COBA ANNUITY FUND and COBA GENERAL FUND<br><br>Nominal Defendants. | Civil Action No. 1:16-cv-08470 (UA)<br><br><br><br><br><br><br><br>**VERIFIED DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND FOR AN ACCOUNTING** |

Plaintiffs Elizabeth Romain, Herman Jiminian, Jeanette Feliciano, Albin Duclet, and

Maria Moreira (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this

complaint derivatively, on behalf of the COBA Annuity Fund and the COBA General Fund for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq.,* breach of fiduciary duty, aiding and abetting, and unjust enrichment, and directly, for an equitable accounting and an accounting pursuant to the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 501(b).

Plaintiffs are all active or retired correction officers and members of the Correction Officers' Benevolent Association ("COBA").  Defendants are various COBA executives and officers, Fund fiduciaries, agents, and co-conspirators.

## INTRODUCTION

1.      In June 2016, Norman Seabrook ("Seabrook") COBA's President, and Murray Huberfeld ("Huberfeld") a principal of Platinum Partners, operator of a New York City hedge fund, were arrested by the Department of Justice ("DOJ").

2.      The DOJ indictment charged Seabrook and Huberfeld with honest services fraud and wire fraud.  A copy of the indictment is attached hereto as Exhibit 1.

3.      According to the indictment, Huberfeld, on Platinum Partners' behalf, bribed Seabrook with $60,000 in cash, delivered in a Ferragamo bag, to invest funds from the COBA Annuity Fund and the COBA General Fund in the Platinum Partners Value Arbitrage Fund ("PPVA").

4.      The PPVA investment was a high-stakes venture, of the type which require that an investor acknowledge that the entire investment may be lost before they are allowed to deposit funds. It was not the type of prudent investment suited to a low-risk benefits fund.

5.      Seabrook invested nearly 20% of the COBA Annuity Fund, and 40% of the COBA General Fund, in the PPVA on his own cognizance.

- 2 -

6.      Seabrook was able to invest in the PPVA without either the approval or knowledge of COBA's Executive Board, which had, for years, failed to supervise Seabrook in any meaningful way. Indeed, Seabrook had ensured the Executive Board's quiescence through liberal dispensations of gift cards, cars, and plush job assignments away from Rikers Island, which ensured they exercised no due diligence over Seabrook's activities.

7.      COBA's law firm, Koehler & Isaacs LLP ("Koehler & Isaacs"), was more loyal to Seabrook than to COBA, the COBA Annuity Fund and the COBA General Fund.  Although Koehler & Isaacs knew that Seabrook had made the high stakes investment, its contract with COBA could be imperiled if Koehler & Isaacs made any representations that called into question Seabrook's activities.  Accordingly Koehler & Isaacs neither advised nor warned the Executive Board about the investment.  Instead, Koehler & Isaacs helped Seabrook co-opt the Executive Board by providing the members with GPS devices and other luxury gifts.

8.      PPVA was a Ponzi scheme, and has since declared bankruptcy.  The COBA Annuity Fund's and the COBA General Fund's investments are virtually worthless.

9.      Accordingly, Plaintiffs here seek to hold Seabrook, the COBA Executive Board, Platinum Partners and its principals, COBA's law firm and auditor, responsible for the harm suffered by the COBA Annuity Fund and the COBA General Fund.

10.     Plaintiffs also seek an accounting from the Executive Board of the COBA Annuity Fund, the COBA General Fund, the COBA Scholarship Fund, the COBA Widows' and Orphans' Fund, the COBA Security Benefits Fund-Active, and the COBA Security Benefits Fund-Retired (collectively, the "Funds," unless identified individually).

## PARTIES

### A. Active Duty Plaintiffs

11.     Plaintiff Elizabeth Romain ("Romain") is an active duty corrections officer, and began working as a corrections officer in 1986.  Romain is an active member of COBA, and is a beneficiary of the COBA Annuity Fund and the COBA General Fund.

12.     Plaintiff Herman Jiminian ("Jiminian") is an active duty corrections officer, and began working as a corrections officer in 2004.  Jiminian is an active member of COBA, and is a beneficiary of the COBA Annuity Fund and the COBA General Fund.

13.     Plaintiff Jeannette Feliciano ("Feliciano") is an active duty corrections officer, and began working as a corrections officer in 1998.  Feliciano is an active member of COBA, and is a beneficiary of the COBA Annuity Fund and COBA General Fund.

### B. Retired Plaintiffs

14.     Plaintiff Albin Duclet ("Duclet") is a retired corrections officer, and worked as a corrections officer from 1990 until 2016.  Duclet is an associate member of COBA, and is a beneficiary of the COBA Annuity Fund and COBA General Fund.

15.     Plaintiff Maria Moreira ("Moreira") is a retired corrections officer, and worked as a corrections officers from 1996 until 2016.  Moreira is an associate member of COBA, and is a beneficiary of the COBA Annuity Fund and COBA General Fund.

### C. Nominal Defendants

16.     Nominal Defendant COBA General Fund is the operating account for COBA, and is managed by the COBA Executive Board (defined below). The COBA General Fund is financed through dues paid by each active COBA member, collected by the City of New York through payroll, and then turned over to COBA.

17.     Nominal Defendant COBA Annuity Fund is an employee retirement benefits fund, which is funded primarily by New York City.  The City contributes to the fund approximately $845 per year per correction officer who has been employed for five years or less, and $1,411 per year per correction officers employed for more than five years.  Upon retirement, the COBA Annuity Fund provides the retired officer with an annuity benefit based upon certain factors, including length of service and profit or loss based upon investment results and administrative costs. The COBA Annuity Fund is managed by a subset of the COBA Executive Board (as defined below), the COBA Annuity Fund Sub-Group Defendants (as defined below).

**D.  COBA Defendants**

18.     Defendant Norman Seabrook ("Seabrook") was the President of COBA from approximately 1995 to June 2016.  Upon information and belief, Seabrook is a citizen of New York.

19.     Defendant Marc Alan Steier ("Steier") is the Director of Legal Affairs for Defendant COBA. Upon information and belief, Steier is a citizen of New York.

20.     Defendant Elias Husamudeen ("Husamudeen") is and was, at all pertinent times, the First Vice President of COBA, and now claims to be the Acting President of COBA.  Upon information and belief, Husamudeen is a citizen of New York.

21.     Defendant Joseph Bracco ("Bracco") is and was, at all pertinent times hereto, the Second Vice President of COBA, and now claims to be the First Vice President.  Upon information and belief, Bracco is a citizen of New York.

22.     Defendant Elizabeth Castro ("Castro") is and was, at all pertinent times hereto, the Third Vice President of COBA and now claims to be the Second Vice President.  Upon information and belief, Castro is a citizen of New York.

23.     Defendant Michael Maiello ("Maiello") is and was, at all pertinent times hereto, the Treasurer of COBA. In his capacity as COBA Treasurer, Maiello is responsible for COBA monies, including depositing COBA monies in such bank or investment institution that may be selected or approved by the COBA Board.  Upon information and belief, Maiello is a citizen of New York.

24.     Defendant Amelia Warner ("Warner") is and was, at all pertinent times hereto, the Financial Secretary of COBA.  Upon information and belief, Warner is a citizen of New York.

25.     Defendant Thomas Farrell ("Farrell") is and was, at all pertinent times hereto, the Legislative Chairman of COBA.  Upon information and belief, Farrell is a citizen of New York.

26.     Defendant Karen Tyson, f/k/a Karen Belfield ("Tyson"), is and was, at all pertinent times hereto, the Recording Secretary of COBA.  Upon information and belief, Tyson is a citizen of New York.

27.     Defendant Benny Boscio ("Boscio") is and was, at all pertinent times hereto, the Sergeant-At-Arms of COBA. Upon information and belief, Boscio is a citizen of New York.

28.     Defendant Kenyatta Johnson ("Johnson") is and was, at all pertinent times hereto, the Corresponding Secretary of COBA. Upon information and belief, Johnson is a citizen of New York.

29.     Defendant Albert Craig ("Craig") is and was, at all pertinent times hereto, either First City Wide Trustee of COBA or the Manhattan Borough Trustee of COBA, a position he formerly held. Upon information and belief, Craig is a citizen of New York.

30.     Defendant Daniel Palmieri ("Palmieri") is and was, at all pertinent times hereto, the Bronx Borough Trustee of COBA.  Upon information and belief, Palmieri is a citizen of New York.

31.     Defendant Angel Castro ("Castro") is and was, at all pertinent times hereto, Manhattan Borough Trustee of COBA.  Upon information and belief, Castro is a citizen of New York.

32.     Defendant Frederic Fusco ("Fusco") is and was, at all pertinent times hereto, the Queens Borough Trustee of COBA.  Upon information and belief, Fusco is a citizen of New York.

33.     Defendant Paulette Bernard, f/k/a Paulette Johnson ("Bernard"), is and was, at all pertinent times hereto, the Brooklyn Borough Trustee of COBA.  Upon information and belief, Bernard is a citizen of New York.

34.     Defendants Seabrook, Husamudeen, Bracco, Castro, Maiello, Warner, Farrell, Tyson, Boscio, Johnson, Craig, Palmieri, Castro, Fusco and Bernard, are or were members of the Executive Board of COBA, and are referred to herein as the "Executive Board Defendants."

35.     Defendants Seabrook, Maiello, along with two other, unknown members of the Executive Board,  managed the Annuity Fund, and are referred to herein and the "Annuity Fund Subgroup Defendants."

36.     The Executive Board Defendants and Steier are sued herein in their professional and personal capacities.

### E.  Platinum Partners Defendants

37.     Defendant Platinum Management (NY) LLC ("Platinum Partners") is a New York Limited Liability Company.  Platinum Management oversees the management of the Platinum Partners hedge funds, including the PPVA.

38.     Defendant Murray Huberfeld ("Huberfeld") is a co-founder and owner of Platinum Partners. As a principal of Platinum Partners, Huberfeld oversees the investments of the PPVA.  Upon information and belief, Huberfeld is a citizen of New York.

39.     Defendant David Bodner ("Bodner") is a co-founder and owner of Platinum Partners. As a principal of Platinum Partners, Bodner oversees the investments of the PPVA. Upon information and belief, Bodner is a citizen of New York.

40.     Defendant Mark Nordlicht ("Nordlicht") is a co-founder and owner of Platinum Partners.  As a principal of Platinum Partners, Nordlicht oversees the investments of the PPVA. Upon information and belief, Nordlicht is a citizen of New York.

## F.   Other Individual Defendants

41.     Defendant Jona Rechnitz ("Rechnitz") is a businessman who acted as a liaison between Platinum Partners and Seabrook and the Executive Board Defendants.   Upon information and belief, Rechnitz is a citizen of New York.

42.     Defendant Jeremy Reichberg ("Reichberg") is a businessman who assisted Rechnitz in serving as a liaison between Platinum Partners and Seabrook and the Executive Board Defendants.  Upon information and belief, Reichberg is a citizen of New York.

## G.   Professional Defendants

43.     Defendant Koehler & Isaacs, LLP ("Koehler & Isaacs"), is and was, at all pertinent times hereto, the law firm for COBA.

44.     Defendant Daniel H. Cook & Associates, Inc. ("Cook & Associates"), is and was, at all pertinent times hereto, the administrator of the COBA Annuity Fund.

45.     Buchbinder Tunick & Company, LLP ("Buchbinder Tunick"), is and was, at all pertinent times hereto, the auditor for the COBA Annuity Fund and the COBA General Fund.

46.     Defendant Sterling Valuation Group ("Sterling Valuation") provided valuation and accounting services to Platinum Partners, including valuation and accounting services related to the PPVA.

## JURISDICTION AND VENUE

47.     This Court has federal question subject matter jurisdiction over this litigation, as a substantial part of this action arises under the laws of the United States, 28 U.S.C. § 1331.

48.     Venue is appropriate in this court as a substantial part of the events or omissions giving rise to this litigation took place in this district.

## SUBSTANTIVE ALLEGATIONS

### A. Background

49.     COBA is New York City's largest correctional officers union, and the largest municipal jail union in the United States. COBA represents more than 9,000 officers employed at Rikers Island and other facilities.

50.     COBA is managed by the ten members of the COBA Executive Board, and five other trustees.

51.     COBA is governed by a Constitution & By-Laws, last revised in January of 2013.

52.     The COBA Annuity Fund operates as an employee retirement benefits fund, financed primarily by the City. The City contributes approximately $845 per year for correction officer who has been employed for five years or less, and $1,411 per year for corrections officers employed for more than five years.

53.     Upon retirement, the COBA Annuity Fund provides the retired officer with an annuity benefit based upon certain factors, such as length of service and profit or loss of the fund.

54.     Upon information and belief, the COBA Annuity Fund held approximately $81 million in assets at the end of 2013, including $72 million invested on the advice of various investment advisors.

55.     The COBA Annuity Fund is supposed to be administered by the Executive Board Defendants, but at some unknown point in the past, the Executive Board devolved responsibility for overseeing the Annuity Fund upon the Annuity Fund Sub-Group Defendants.

56.     The COBA General Fund operates as COBA's operating account, financed through a dues checkoff from each active COBA member, collected by the City of New York through payroll withholding, and then turned over to COBA.  The City takes a small fee for performing this service.

57.     The COBA General Fund is funded through an annual budget process.  Upon information and belief, in June 2014, the COBA General Fund contained $8 million in cash.

58.     The COBA General Fund is supposed to be administered by the Executive Board Defendants.

**B.  The Platinum Partners Investments**

59.     In late 2013, Seabrook, then the President of COBA, met Rechnitz through Phillip Banks, formerly the highest ranking uniformed officer with the New York Police Department.

60.     Shortly after meeting Seabrook, Rechnitz and Reichberg took him on an all-expense paid trip to the Dominican Republic.  During this trip, Seabrook told Rechnitz that he worked hard to invest COBA's money, and wanted to benefit personally from his investment

decisions.  According to information in the indictment filed against Seabrook, he explained to Rechnitz, that it was time that "Norman Seabrook got paid."  Other Rechnitz and Reichberg financed trips were made to Israel and Las Vegas.

61.     Rechnitz introduced Seabrook to Huberfeld, who was actively attempting on Platinum Partners' behalf to find investors in the PPVA.

62.     With the connivance of Rechnitz, Huberfeld agreed that if COBA funds were invested with Platinum Partners, Platinum Partners would pay Seabrook a personal kickback in exchange for facilitating the investment.

63.     Platinum Partners agreed to pay Seabrook between $100,000 and $150,000, dependent upon how much COBA invested with Platinum Partners.

64.     In or around January 2014, Platinum Partners' representatives met with the Annuity Fund Sub-Group Defendants, to discuss investing in PPVA.  Following this presentation, the Annuity Fund Sub-Group Defendants authorized an investment of $10 million of the COBA Annuity Fund in the PPVA.

65.     In August 2014, the Annuity Fund Sub-Group Defendants approved the investment of an additional $5 million in the PPVA.

66.     Upon information and belief, the Annuity Fund Sub-Group Defendants did not seek prior approval of the Executive Board Defendants before making these investments.

67.     In or around June 2014, an additional $5 million from the COBA General Fund was invested in the PPVA by Seabrook without the Executive Board Defendant's knowledge.

68.     Maiello, in his role as role as COBA's treasurer, signed off on the COBA Annuity Fund and COBA General Fund investments without properly vetting the transaction.

69.     Steier, in his role as role as COBA's legal counsel, knew that the COBA Annuity Fund and COBA General Fund investments had not been properly vetted by the Executive Board.

70.     COBA's Annuity Fund investment in PPVA represented an investment of nearly 20% of the monies in the COBA Annuity Fund.

71.     The COBA Annuity Fund investments were made via wire transfer.

72.     COBA's General Fund investment in PPVA represented an investment of approximately 40% of the monies in COBA's General Fund.

73.     The COBA General Fund investment was made via wire transfer.

## C. The Platinum Partners Kickback

74.     In December 2014, Seabrook began demanding his first kickback payment from Platinum Partners.  Huberfeld, on Platinum Partners' behalf, facilitated an initial payment of $60,000 to Seabrook, using Rechnitz and Reichberg as intermediaries.  Upon information and belief, Seabrook's kickback request was known to Bodner and Nordlicht.

75.     On or about December 11, 2014, Rechnitz arranged to meet Seabrook to pay him the $60,000 kickback in cash.  The money was delivered to Seabrook on Lexington Avenue and 39th Street in a Ferragamo bag, purchased by Rechnitz especially for that purpose.

76.     A few days later, Huberfeld arranged for Rechnitz to be reimbursed by Platinum Partners. Rechnitz' company created a fake invoice for 16 Knicks tickets, which were "sold" to Platinum Partners for $60,000, or $7,500 per ticket (the Knicks were, at the time of the invoice, 4-20).  The invoice was provided to Platinum Partners via e-mail.

**D.  Platinum Partners was a high-risk Ponzi Scheme**

77.     Platinum Partners generally, and PPVA specifically, were part of a Ponzi scheme, and in fact, the COBA investment in PPVA was integral to the scheme's continued survival.

78.     As described in the indictment against Seabrook and Huberfeld, the PPVA invested in assets in sectors such as energy, mining, and Asia-based arbitrage opportunities.

79.     As no market existed for these assets, Platinum Partners initially valued them internally.

80.     After this internal evaluation, Sterling Valuation did an external valuation that, upon information and belief, corroborated the values of Platinum Partner's investments, without properly reviewing or vetting them.

81.     From 2012 forward, Platinum received far more redemption requests than capital inflows; Platinum Partners met these redemption requests through a combination of high-interest loans and paying investors out of capital inflows from new and existing investors.

82.      Municipal investors, such as COBA, were key to keeping the PPVA scheme moving forward, and COBA's ability to contribute large amounts of capital provided a lifeline to PPVA.

83.     In the same month the COBA Annuity Fund made its initial $10 million investment in the PPVA, the PPVA faced requests of several million dollars' worth of redemptions.  On the same day that the $10 million was received by PPVA, $4.5 million in redemption requests were immediately processed.

84.     By August 2014, when the COBA Annuity Fund made its final PPVA investment, COBA had become PPVA's largest investor for the time period between 2013 and August 2014, and had provided in excess of half of the PPVA's funding for 2014.

85.     Even after the August 2014 investment, Huberfeld continued to solicit investments from COBA, in part to meet $44 million in looming redemption requests. Internal Platinum Partners emails described Seabrook being "worked" for investments, and that Seabrook had promised that "he will send [Platinum Partners] more money shortly."

86.     In late May, 2015, the United States District Attorney's Office for the Southern District of New York served subpoenas on COBA and Platinum Partners.

87.     In June 2016, Huberfeld and Seabrook were arrested by the federal government and charged with honest services fraud and wire fraud.

88.     In early July 2016, Platinum Partners announced that it would liquidate its funds, including the PPVA.

89.     In August 2016, a liquidator was appointed by a Cayman Islands court.

90.     On October 19, 2016, PPVA filed for Chapter 15 bankruptcy protection in the United States, citing "severe and substantial liquidity problems."

**E.  The Executive Board Defendants Provided No Meaningful Check on Seabrook**

91.     Although required, under New York's Not-For-Profit Corporation Law, §§ 717 and 719, to oversee the investments of the COBA Annuity Fund and the COBA General Fund, the Executive Board completely abnegated its responsibility to do so.

92.     Had the Executive Board exercised even a modicum of its oversight responsibility by putting in proper safeguards to prevent illegal and improper activity, it would have been impossible for Seabrook to have invested the monies of the COBA Annuity Fund and the COBA General Fund into a high risk, hard to value investment vehicle like PPVA; let alone an investment of nearly 20% of the COBA Annuity Fund, and 40% of COBA General Fund.

93.     Moreover, the Annuity Fund Sub-Group Defendants knew, or should have known, that the PPVA investment was highly risky.  Upon information and belief, these Annuity Fund Sub-Group Defendants were informed by Koehler & Isaacs that Platinum Partner's subscription agreement required the COBA Annuity Fund to acknowledge that it had "the financial ability to bear the economic risk of losing its entire investment," an acknowledgment that typically accompanies investments in high-risk vehicles, and is atypical of the type of investment usual for a prudent investor, especially an investor charged with safeguarding workers' retirement funds.

94.     Although Koehler & Isaacs' fiduciary duty was to COBA as a whole as well as to the COBA Annuity Fund and COBA General Fund, Koehler & Isaacs took no steps to inform the Executive Board Defendants that the PPVA investment was one that was high risk.  Nor did Koehler & Isaacs inform the Board that the PPVA investment represented almost 20% of the entire COBA Annuity Fund.

95.     Buchbinder Turnick, as the auditor of the COBA Annuity Fund knew or should of known that 20% of the entire COBA Annuity Fund had been invested in a high-risk, hard to value investment, but did not inform the Executive Board.

96.     The PPVA investment is now worthless.

**F.  The Executive Board Defendants a Provided No Meaningful Check On Seabrook Because He Gave These Defendants Substantial Benefits To Look the Other Way**

97.     Each of the members of the Executive Board was personally selected by Seabrook, and their continued service on the Executive Board was due to their personal fealty to Seabrook.

98.     Service on the Executive Board entitled the Executive Board Defendants to extra compensation, over and above that received by them in their positions as corrections officers.

99.     Further, service on the Executive Board allowed the Executive Board Defendants to work only during daytime hours, and allowed them to avoid service at Rikers Island. Instead, they were given offices at the COBA headquarters.

100.    The Executive Board Defendants received substantial emoluments from COBA's various vendors, including envelopes stuffed with gift cards, delivery of which was arranged by Seabrook.

101.    On one occasion, Cook & Associates provided each of the Executive Board Defendants with between $500 and $1000 in cash, and each year provided the Executive Board Defendants with annual Christmas gifts.

102.    On one occasion, Koehler & Isaacs provided the Executive Board Defendants with expensive GPS systems. Other substantial emoluments were also provided by Koehler & Isaacs to the Executive Board Defendants as annual Christmas gifts.  Seabrook himself bragged that Koehler & Isaacs provided him with a black no-limit American Express Card.

103.    Various vendors also provided the Executive Board Defendants with tickets to sporting events and concerts.

104.    Seabrook made sure that Executive Board Defendants were provided with access to cars, including money for gas, tolls, and maintenance.

105.    Seabrook's benefices, liberally bestowed, ensured that the Executive Board Defendants turned a blind eye to any suspicious conduct, and failed to put in place any safeguards to protect the COBA members and their hard earned funds.

106.    But for the Executive Board Defendants' dereliction of their fiduciary duties, Seabrook would have been unable to invest in Platinum Partners.

## DEMAND FUTILITY

**A. Demand by Romain, Jiminian, and Feliciano upon the COBA Board that they Act Would Be Futile**

107.    As described above, each of the Executive Board Defendants was and is complicit in Seabrook's Breach of Fiduciary Duty.

108.    By virtue of their positions on the Executive Board, the Executive Board Defendants owed COBA and its members the fiduciary duties of loyalty, good faith, due care, and disclosure in the management and administration of the COBA Annuity Fund and COBA General Fund. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as members of the Executive Board, the absence of good faith on their part, and a reckless disregard for their duties to the COBA Annuity Fund and COBA General Fund. The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties, posed a risk of serious injury to the COBA Annuity Fund and COBA General Fund.

109.    A demand upon the Executive Board Defendants that they institute litigation against Seabrook and themselves, would be a useless and futile act. Accordingly, demand is excused.

110.    Thus, Romain, Jiminian, and Feliciano may institute and prosecute this litigation derivatively on COBA's behalf.

**B. As Non-Active COBA Members, Duclet and Moreira are not Required to Make a Demand**

111.    As described in COBA's Constitution and By-Laws, only Active Members of COBA may make a demand upon the Executive Board that they investigate and remedy misconduct involving COBA members.

112.     Duclet and Moreira are retired, and are not considered Active Members of COBA.

113.     Accordingly, though they are beneficiaries of the COBA Annuity Fund Duclet and Moreira have no method to demand that the COBA Executive Board act to remedy the harms suffered by COBA.

114.     Thus, Duclet and Moreira may institute and prosecute this litigation derivatively on COBA's behalf.

## COUNT I

**(Civil Violations of RICO by all Plaintiffs on Behalf of the COBA Annuity Fund and the COBA General Fund Against Defendants Seabrook, Platinum Partners, Huberfeld, David Bodner, Nordlicht, Rechnitz, Reichberg, Sterling Valuation and Koehler & Isaacs)**

115.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

116.     The COBA General Fund and COBA Annuity Fund are "person(s)" within the meaning of 18 U.S.C. § 1967(c).

117.     At all times relevant hereto, the COBA General Fund and COBA Annuity Fund and each Member of the Enterprise were "persons" within the meaning of 18 U.S.C. § 1961(3).

### The RICO Enterprise

118.     An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

119.     The enterprise at issue in this case, for purposes of 18 U.S.C. 1961(3) and 1962(a), 1962(b), 1962(c) and 1962(d) is an association-in-fact collectively referred to herein as "the Enterprise."

120.    The Enterprise consists of Defendants Seabrook, Platinum Partners, Huberfeld, Bodner, Nordlicht, Rechnitz, Reichberg, Sterling Valuation, and Koehler & Isaacs ("RICO Defendants").

121.    The RICO Defendants maintained an interest in and control of the Enterprise and also conducted or participated, to a lesser or greater extent, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

122.    The RICO Defendants also have an existence separate and distinct from the Enterprise.

123.    The RICO Defendants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme.

124.    The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the RICO Defendants engaged.

125.    The number of wrongdoers in the Enterprise fluctuated depending on the number of co-conspirators that were colluding on each particular predicate crime.

126.    The members of the Enterprise shared money, costs, information, resources and the fruits of its predicate acts.  The association-in-fact Enterprise functioned as a continuing unit, pursuing a course of conduct as set forth herein, with a common and shared purpose with a continuity of structure and personnel.

127.    The RICO Defendants and all those employed by or associated with the Enterprise, which engaged in interstate commerce, have conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. 1962 §§ (a)(b)(c) & (d) by pursuing or facilitating kickbacks, bribes, breaches of fiduciary duties, and acts of fraud against the COBA Annuity Fund and COBA General Fund.

128.    The RICO Defendants have violated 18 U.S.C. § 1962 by knowingly, intentionally, and unlawfully, aiding and abetting each other and the Enterprise by participating, directly or indirectly, in the conduct of the affairs of the Enterprise, through the pattern of racketeering activity described herein.

129.    The particulars of the scheme as set forth above were achieved through the use of the mails and/or wires.

### Predicate Acts

130.    With respect to the activities alleged herein, the Enterprise acted at all time with malice towards the COBA Annuity Fund and COBA General Fund, with the intent to engage in the conduct complained of for the monetary benefit of RICO Defendants and other members of the Enterprise. Such conduct was done with actionable wantonness and reckless disregard for the rights of the COBA Annuity Fund and COBA General Fund.

131.    The RICO Defendants, as members of the Enterprise, conspired with other co-conspirators to violate 18 U.S.C § 1962, by soliciting kickbacks and bribes in violation of State and Federal law, and by converting and/or misappropriating funds belonging to t the COBA Annuity Fund and COBA General Fund for their personal use through racketeering activity.

132.    The Enterprise's schemes have resulted in severe financial losses to the COBA Annuity Fund and COBA General Fund.  Moreover, as a result of the Enterprise's racketeering activity, the COBA Annuity Fund and COBA General Fund have suffered extensive monetary damages, in the tens of millions of dollars.

133.    18 U.S.C. § 1961(1) provides that "racketeering activity means any act indictable under any of the following provisions of Title 18, United States Code:" § 1343 (relating to wire fraud)... § 1346 (relating to scheme or artifice to defraud).

- 20 -

134.    On June 8, 2016, Seabrook and Huberfeld were indicted by a grand jury in the Southern District of New York for violations of Title 18, United States Code, Sections 1343, 1346, 1349, and 2.

135.    The indictment and complaint by the United States Attorney documented multiple acts of honest services fraud and wire fraud, as all part of a scheme by the RICO Defendants to deprive and defraud the COBA membership of its funds, through the depletion of multiple accounts, the misappropriation of COBA funds for personal use, and the receipt of excessive gifts, bribes, and kickbacks from vendors, at the expense of the membership.

**Effect on Interstate Commerce**

136.    The Enterprise described above has engaged in and has effected interstate commerce by acts including the transmission of monies across state lines, including to the Cayman Islands by wire, by transmission of correspondence, emails, and letters across state lines, by operating the business of the members of the Enterprise through activities across state lines, including travel across state lines and internationally, and by conducting economic activity affecting large national industries and multiple states.

**COUNT II**

**(Breach of Fiduciary Duty Claim by all Plaintiffs on Behalf of the COBA Annuity Fund and the COBA General Fund Against Defendant Seabrook)**

137.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

138.    By reason of his fiduciary relationship with COBA and his position, Seabrook owed and owe the COBA Annuity Fund and the COBA General Fund the highest obligation of loyalty, good faith, due care, oversight, and candor.

139.     In derogation of these duties, Seabrook did, in exchange for substantial remuneration from Platinum Partners, invest approximately $20 million in COBA funds from the COBA Annuity Fund and the COBA General Fund, in PPVA.

140.     This investment was not, and could not have been, a valid exercise of business judgment.

141.     As a result of Seabrook's breach of fiduciary duty, the COBA Annuity Fund and the COBA General Fund have sustained significant damages, as alleged herein.

142.     Seabrook is liable to the COBA Annuity Fund and the COBA General Fund for the damages sustained.

143.     Plaintiffs, on behalf of the COBA Annuity Fund and COBA General Fund, have no adequate remedy at law.

## COUNT III

**(Breach of Fiduciary Duty Claim by all Plaintiffs on behalf of the COBA Annuity Fund Against Steier and Koehler & Isaacs)**

144.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

145.     By reason of their fiduciary relationship with COBA and the COBA Annuity Fund, Steier and Koehler & Isaacs owed and owe the COBA Annuity Fund the highest obligation of loyalty, good faith, due care, oversight, and candor.

146.     In derogation of these duties, and despite knowing that the Platinum Partners investment was imprudent, and that the Annuity Fund was unable to sign the acknowledgement that it had "the financial ability to bear the economic risk of losing its entire [PPVA] investment," Steier and Koehler & Isaacs did not inform the Executive Board that Annuity Fund had invested $15 million in the PPVA.

147.     Steier and Koehler & Isaacs did not do so, because their primary loyalty was to Seabrook, not to their clients: COBA and the COBA Annuity Fund.

148.     As a result of Steier's and Koehler & Isaacs' breach of fiduciary duty, the COBA Annuity Fund has sustained significant damages, as alleged herein.

149.     Steier and Koehler & Isaacs are liable to the COBA Annuity Fund for the damages sustained.

150.     Plaintiffs, on behalf of the COBA Annuity Fund, have no adequate remedy at law.

## COUNT IV

**(Breach of Fiduciary Duty Claim by all Plaintiffs on Behalf of the COBA Annuity Fund and COBA General Fund Against the Executive Board Defendants)**

151.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

152.     By reason of their fiduciary relationship with COBA and their positions on the Executive Board, the Executive Board Defendants owed and owe COBA the highest obligation of loyalty, good faith, due care, oversight, and candor.

153.     In derogation of these duties, the Executive Board Defendants failed to implement safeguards that would have prevented the conduct alleged herein, including Seabrook's waste of the assets of the COBA Annuity Fund and COBA General Fund.

154.     As a result of the Executive Board Defendants' breaches of fiduciary duty, the COBA Annuity Fund and the COBA General Fund have sustained significant damages, as alleged herein.

155.     The Executive Board Defendants are liable to the COBA Annuity Fund and the COBA General Fund for the misconduct alleged herein.

156.    Plaintiffs, on the COBA Annuity Fund's and the COBA General Fund's behalf, have no adequate remedy at law.

## COUNT V

**(Unjust Enrichment Claim by all Plaintiffs on Behalf of the COBA Annuity Fund and COBA General Fund Against the Executive Board Defendants**

157.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

158.    By their wrongful acts and omissions, the Executive Board Defendants were unjustly enriched at the expense of and to the detriment of COBA Annuity Fund and COBA General Fund.  The Executive Board Defendants were unjustly enriched as a result of the excessive compensation, remuneration, and gifts they received while breaching fiduciary duties owed to COBA.

159.    Plaintiffs seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, gifts, and compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

160.    Plaintiffs, on behalf of COBA, have no adequate remedy at law.

## COUNT VI

**(Aiding and Abetting Breaches of Fiduciary Duty Claim by all Plaintiffs on Behalf of the COBA Annuity Fund and the COBA General Fund Against Koehler & Isaacs, Cook & Associates, and Buchbinder Tunick)**

161.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

162.    Seabrook was able, through the use of gifts, such as GPS devices and sporting and concert tickets, from corporate vendors, including Koehler & Isaacs, Cook & Associates, and

Buchbinder Tunick, to maintain his control over the Executive Board Defendants, and to ensure that they did not inquire into his conduct and machinations.

163.    Koehler & Isaacs, Cook & Associates, and Buchbinder Tunick knew that Seabrook was using these gifts, and promises of continued access to them, to maintain his control over the Executive Board Defendants, and to ensure that they did not inquire into his conduct and machinations.

164.    Accordingly, Koehler & Isaacs, Cook & Associates, and Buchbinder Tunick aided and abetted Seabrook in his breaches of fiduciary duty to the COBA Annuity Fund and COBA General Fund.

165.    Moreover, Koehler & Isaacs, Cook & Associates, and Buchbinder Tunick as the COBA Annuity Fund and COBA General Fund lawyers, administrators, and auditors, respectively, knew of Seabrook's breaches of fiduciary duty, but did nothing.

166.    Plaintiffs, on behalf of the COBA Annuity Fund and the COBA General Fund, have no adequate remedy at law.

## COUNT VI

**(Claim by all Plaintiffs Directly Against the Executive Board Defendants For an Equitable Accounting and an Accounting Pursuant to LMRDA § 29 U.S.C. § 501(b))**

167.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

168.    The Executive Board Defendants, as the day to day operators of COBA Annuity Fund, the COBA General Fund, the COBA Widows' and Childrens' Benefit Fund, the COBA Scholarship Fund, the COBA Security Benefits Fund-Active, and the COBA Security Benefits Fund-Retired, owed and owe a fiduciary duty to the Plaintiffs to use the monies received in the

best interests of the Funds, and to do so in the utmost good faith, honestly, diligently, and without preference to their own interests

169.    As to the COBA Annuity Fund and the COBA General Fund, the Executive Board Defendants have breached their fiduciary duty,

170.    Moreover, the Executive Board Defendants oversee the COBA Widows' and Children's' Benefits Fund, the COBA Scholarship Fund, the COBA Security Benefits Fund-Active, and the COBA Security Benefits Fund-Retired, and the Executive Board Defendant's conduct with respect to the Funds is suspect.

171.    Plaintiffs are entitled to an equitable accounting of the business, finances, and affairs of each of the Funds

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

a. Against all of the Executive Board Defendants, Steier, Koehler & Isaacs, Cook & Associates, and Buchbinder Tunick in favor of the COBA Annuity Fund and the COBA General Fund for the amount of damages sustained by them as a result of the Executive Board Defendants' breaches of fiduciary duties;

b. Against all of the RICO Defendants and in favor of the COBA Annuity Fund and the COBA General Fund for the amount of damages sustained by them as a result of the RICO Defendants' conspiracy;

c. An order directing the removal of each the Executive Board Defendants, and their replacement by new Executive Board members, elected by the active members of COBA;

d. An order directing an accounting of the Funds

e. Awarding to Plaintiff the costs and disbursements of the action, including reasonable

attorneys' fees, accountants' and experts' fees, costs, and expenses; and

f.   And such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Dated:      New York, New York
            October 31, 2016

Respectfully,

**NEWMAN FERRARA LLP**

By:   *s/ Jeffrey M. Norton*

Jeffrey M. Norton
Roger A Sachar Jr., *pro hac pending*
1250 Broadway, 27th Floor
New York, NY 10001
(212) 619-5400

**SEELIG LAW OFFICES, LLC**

By:   *s/ Philip H. Seelig*

Philip H. Seelig
299 Broadway, Suite 1600
New York, NY 10007
(212) 766-0600