UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELIZABETH ROMAIN, et al.,
                      Plaintiffs,

-v-

NORMAN SEABROOK, et al.,
                      Defendants.

16-CV-8470 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

    Plaintiffs Elizabeth Romain, Herman Jiminian, Jeanette Feliciano, Albin Duclet, and Maria Moreira are a group of active-duty and retired corrections officers. Plaintiffs belong to the Corrections Officers Benevolent Association, Inc. ("COBA") and are beneficiaries of COBA's Annuity Fund, a retirement benefits fund, and COBA's General Fund, the union's operating account. The two Funds are nominal defendants in this action.

    Defendant Norman Seabrook ("Seabrook") is the former President of COBA. Defendants Elias Husamudeen, Joseph Bracco, Elizabeth Castro, Michael Maiello, Amelia Warner, Thomas Farrell, Karen Tyson, Benny Boscio, Kenyatta Johnson, Albert Craig, Daniel Palmieri, Angel Castro, Frederic Fusco, and Paulette Bernard (collectively, "Executive Board Defendants") hold various positions on COBA's Executive Board. Defendant Koehler & Isaacs, LLP ("Koehler & Isaacs") is a law firm that represents COBA.

    In 2016, Seabrook and Defendant Murray Huberfeld ("Huberfeld"), co-founder and President of Defendant Platinum Management (NY) LLC ("Platinum"), were arrested and indicted for honest services wire fraud and conspiracy to commit honest services wire fraud. The indictment charged these Defendants with participation in a kickback scheme, where Seabrook

1

would invest money from COBA's Annuity Fund and General Fund with Platinum in exchange for personal payments from the investment firm.

On the basis of this alleged scheme, Plaintiffs filed this suit derivatively on behalf of COBA against Seabrook, the Executive Board Defendants, and Koehler & Isaacs for breach of fiduciary duty, and against Koehler & Isaacs only for aiding and abetting breach of fiduciary duty. Plaintiffs also assert a claim for an equitable accounting against the Executive Board Defendants directly, and derivative claims against the Executive Board Defendants only for unjust enrichment and an injunction prohibiting them from advancing Seabrook's legal fees in the criminal case against him.

Finally, Plaintiffs assert a derivative claim against Seabrook, Platinum, Huberfeld, and Defendant Jona Rechnitz ("Rechnitz") for civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*[1]

The Executive Board Defendants, Koehler & Isaacs, and Rechnitz all filed separate motions to dismiss.[2]

The Executive Board Defendants also filed a motion under Federal Rule of Civil Procedure 11 for sanctions against Plaintiffs and their counsel for allegedly making "legal contentions unwarranted by existing law without a non-frivolous argument otherwise." (Dkt. No. 120 at 1.) In response, Plaintiffs filed a motion for Rule 11 sanctions against the Executive

---

[1] The original complaint in this action also named two other co-founders and owners of Platinum, David Bodner and Mark Nordlicht, as Defendants. (Dkt. No. 4 ¶ 39–40.) The Court stayed the action as to Defendant Nordlicht (Dkt. No. 125) in light of a receivership order in the Eastern District of New York. *See SEC v. Platinum Management (NY) LLC, et al.*, 16 Civ. 6848 (E.D.N.Y.). Neither Nordlicht nor Bodner is named in Plaintiffs' amended complaint. (Dkt. No. 106.)

[2] Seabrook filed a letter "join[ing] the motions to dismiss the First Amended Complaint of the other defendants." (Dkt. No. 134.)

2

Board Defendants on the grounds that their motion "lacks any meritorious basis . . . and was filed for improper purposes." (Dkt. No. 144 at 1.)

For the reasons that follow, the motions to dismiss are granted, and the respective motions for sanctions are denied.

**I.    Background**

The following facts are taken from the Amended Complaint and are presumed true for the purposes of this motion.

COBA is New York City's largest correctional officers union, representing more than 9,000 officers. (Dkt. No. 106 ("FAC") ¶ 52.) The union is managed by a ten-member Executive Board and five other trustees. (FAC ¶ 53.) Upon retirement, COBA members are eligible to receive an annuity benefit from the COBA Annuity Fund, which is funded primarily by New York City. (FAC ¶ 55.) The COBA Annuity Fund is administered by the COBA Executive Board, which has in turn delegated responsibility for overseeing the Fund to a "sub-group" of Board members (collectively, "Annuity Fund Sub-Group Defendants"). (FAC ¶¶ 55, 57.) The Executive Board also manages the COBA General Fund, an operating account that is financed by membership dues. (FAC ¶ 58.)

In late 2013, Norman Seabrook, then-President of COBA,[3] was introduced to Jona Rechnitz. (FAC ¶ 61.) In November and December 2013, they twice traveled together to the Dominican Republic, and Rechnitz paid for the flights. (FAC ¶¶ 62–63.) Rechnitz then helped arrange a kickback scheme between Seabrook and Defendant Murray Huberfeld, co-founder and President of Platinum, a hedge fund management company. (FAC ¶¶ 40–41.) Under the

---

[3] According to the Executive Board Defendants, the Board voted to remove Seabrook on November 8, 2017, without regard to the outcome of his criminal trial. (Dkt. No 160 at 7 n.3.)

3

agreement, Platinum would pay Seabrook a personal kickback of $100,000 to $150,000 per year if he facilitated the investment of COBA funds with Platinum. (FAC ¶¶ 65–66.)

Around January 2014, Platinum representatives met with Seabrook, Defendant Michael Maiello (COBA's treasurer), and two other Executive Board Members to discuss investing COBA funds in the Platinum Partners Value Arbitrage Fund ("PPVA"). (FAC ¶¶ 38, 67.) The Amended Complaint alleges that PPVA, which invested in energy, mining, and Asia-based arbitrage opportunities, was a "Ponzi scheme." (FAC ¶¶ 79–80.) After this meeting, the Annuity Fund Sub-Group Defendants authorized investment of $10 million of the COBA Annuity Fund in PPVA. (FAC ¶ 67.) In August 2014, they approved an additional $5 million investment. (FAC ¶ 68.) Plaintiffs allege, on information and belief, that the Annuity Fund Sub-Group Defendants did not seek the full Executive Board's approval before making these two investments, which constituted nearly 20% of the Annuity Fund. (FAC ¶¶ 69, 72.) In fact, Seabrook "typically" made investment decisions regarding the Annuity Fund's money "without input from the Annuity Fund Board of the Executive Board." (FAC ¶ 96.)

Around June 2014, Seabrook invested an additional $5 million in PPVA, this time from the COBA General Fund. (FAC ¶ 70.) He made this investment, which constituted approximately 40% of the General Fund, without the Executive Board's knowledge. (FAC ¶¶ 70, 74.) Maiello approved all of these investments "without properly vetting the transaction[s]." (FAC ¶ 71.)

Plaintiffs allege that the other members of the Executive Board "rarely question[ed] Seabrook." (FAC ¶ 100.) Seabrook secured the Board members' loyalty with "substantial emoluments from COBA's various vendors, including envelopes stuffed with gift cards," and "access to cars, including money for gas, tolls, and maintenance." (FAC ¶¶ 101, 105.) The

Executive Board Defendants also received annual Christmas gifts and cash gifts of "between $500 and $1000" from Daniel H. Cook & Associates, COBA's fund administrator, and "expensive GPS systems" from Defendant Koehler & Isaacs, COBA's law firm. (FAC ¶¶ 43, 102–03.) Seabrook and the Executive Board also used COBA funds to purchase tickets to "sporting events and concerts." (FAC ¶ 104.)

In December 2014, Seabrook demanded payment of his first kickback from Platinum. Huberfeld arranged for Rechnitz to deliver a $60,000 kickback to Seabrook in a Ferragamo bag. (FAC ¶ 77.)

In June 2016, Huberfeld and Seabrook were arrested by the federal government and charged with honest services fraud and wire fraud. The next month, Platinum announced that it would liquidate its funds. (FAC ¶¶ 88–89.) On October 19, 2016, PPVA filed for Chapter 15 bankruptcy. (FAC ¶ 91). COBA's PPVA investments are "now worthless." (FAC ¶ 98.)

On October 31, 2016, Plaintiffs filed this suit, asserting a direct claim for an equitable accounting and derivative claims on behalf of COBA's membership. (Dkt. No. 4 at 2.) After Defendants filed a first round of motions to dismiss the original complaint, Plaintiffs filed an amended complaint on May 17, 2017, asserting claims for: breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, civil RICO violations, unjust enrichment, injunctive relief, and equitable accounting. (FAC ¶¶ 147–216) The Executive Board Defendants, Koehler & Isaacs, and Rechnitz all filed motions to dismiss. (Dkt. Nos. 121, 123, 127.) The Executive Board Defendants and Plaintiffs have also filed respective motions for Rule 11 sanctions against each other. (Dkt. Nos. 119, 143.)

## II. Motions to Dismiss

### A. Legal Standards

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when plaintiffs plead facts that would allow "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The Court must accept as true all well-pleaded factual allegations in the complaint, and 'draw [ ] all inferences in the plaintiff's favor.'" *Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 478 (S.D.N.Y. 2013) (quoting *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Federal Rule of Civil Procedure 23.1 "requires that a plaintiff in a . . . derivative action 'state with particularity . . . any effort by the plaintiff to obtain the desired actions from the directors . . . and . . . the reasons for not obtaining the action or not making the effort.'" *Canty v. Day*, 13 F. Supp. 3d 333, 341 (S.D.N.Y. 2014), *aff'd*, 599 F. App'x 20 (2d Cir. 2015) (second, third, and fourth alterations in original) (quoting Fed. R. Civ. P. 23.1(b)(3)). "This rule sets forth a 'rule of pleading' as to 'the specificity of facts alleged with regard to efforts made to urge a corporation's directors to bring the action in question,' which is referred to as 'demand' on the corporation."[4] *Id.* at 341–42 (quoting *Halebian v. Berv*, 590 F.3d 195, 206 n.7 (2d Cir. 2009)).

---

[4] COBA is organized as a not-for-profit corporation under New York law. (FAC ¶ 19.)

"In contrast to a motion to dismiss pursuant to Rule 12(b)(6), a Rule 23.1 motion to dismiss for failure to make a demand is not intended to test the legal sufficiency of the plaintiffs' substantive claim," but instead "its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf." *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 273 (S.D.N.Y. 2006) (second quoting *Levine v. Smith*, 1989 WL 150784, at *5 (Del. Ch. 1989), *aff'd*, 591 A.2d 194 (Del. 1991)). "Because Rule 23.1 requires that plaintiffs make particularized allegations, it imposes a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6)." *Canty*, 13 F. Supp. 3d at 342 (quoting *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010), *aff'd*, 415 F. App'x 285 (2d Cir. 2011)). "The 'adequacy' of a plaintiff[']s pre-suit demand efforts 'is to be determined by state law absent a finding that application of state law would be inconsistent with a federal policy underlying a federal claim in the action.'" *Id.* (quoting *Halebian*, 590 F.3d at 206 n.7). Because it is undisputed that COBA is a New York not-for-profit corporation, New York law governs the adequacy of Plaintiffs' pre-suit demand. *See id.*

B.  **Discussion**

1.  **Standing Under Federal Rule of Civil Procedure 23.1**

Koehler & Isaacs, the Executive Board Defendants, and Rechnitz contend that Plaintiffs lack standing to sue derivatively on behalf of the COBA Annuity Fund and COBA General Fund. (Dkt. No. 122 at 9, Dkt. No. 124 at 6–11, Dkt. No. 128 at 14.)[5]

---

[5]  Seven of the eight counts in the amended complaint are pleaded derivatively on behalf of the two COBA funds. Only Count VIII, the equitable accounting claim, is brought directly by Plaintiffs. (Dkt. No. 106 at 25–34.)

Under Federal Rule of Civil Procedure 23.1, "[a] derivative action complaint must allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority . . . and the reasons for his failure to obtain the action or for not making the effort." *Laufer v. Olla Indus., Inc.*, 96 F.R.D. 230, 232 (S.D.N.Y. 1982), *aff'd*, 729 F.2d 1444 (2d Cir. 1983) (quoting Fed. R. Civ. P. 23.1.) Plaintiffs admit that they did not make any pre-suit demand upon the Executive Board. (FAC ¶137.) Instead, they contend that the demand requirement is excused because any such demand would have been futile. (FAC ¶¶ 137–46.)

Under New York law, demand is excused because of futility when a complaint alleges with particularity that either:

> [1] A majority of the board of directors is interested in the challenged transaction. Director interest may either be self-interest in the transaction at issue, or a loss of independence because a director with no direct interest in a transaction is "controlled" by a self-interested director . . . [2] the board of directors did not fully inform themselves about the challenged transaction to the extent reasonably appropriate under the circumstances. The long-standing rule is that a director does not exempt himself from liability by failing to do more than passively rubber-stamp the decisions of the active managers . . . [or 3] . . .the challenged transaction was so egregious on its face that it could not have been the product of sound business judgment of the directors.

*Marx v. Akers*, 88 N.Y.2d 189, 200–01 (1996) (citations omitted) (quoting *Barr v. Wackman*, 36 N.Y.2d 371, 381 (1975)). Here, Plaintiffs allege futility on the basis of (1) self-interest and (2) failure to self-inform. (FAC ¶¶ 137–46.)

### a. Self-interest

At the outset, the Court rejects Plaintiffs' claim that the Executive Board was self-interested because its members "face substantial likelihood of liability." (Dkt No. 106 ¶ 139.) It is well established that "[t]he bare claim that the directors . . . should be viewed as interested

8

because they are 'substantially likely to be held liable' for their actions is not enough" to demonstrate demand futility under New York law. *Wandel ex rel. Bed Bath & Beyond, Inc. v. Eisenberg*, 871 N.Y.S.2d 102, 105 (App. Div. 1st Dep't 2009).

Plaintiffs further allege that the Executive Board "lack[ed] independence" and was "completely beholden" to Seabrook. (FAC ¶¶ 138, 143.) More specifically, Plaintiffs claim that Seabrook exerted control over the Board by providing "gifts" and "substantial emoluments," including "sporting and concert tickets," "COBA credit cards, gas allowances, car leases . . . GPS devices and cash." (Dkt. No. 155 at 18.)

The Court concludes that Plaintiffs have failed to allege demand futility with the requisite particularity. First, in order to establish demand futility on the basis of the Board's self-interest, Plaintiffs must demonstrate that a "majority of the [members] should be treated as interested." *Wandel*, 871 N.Y.S.2d at 104. For example, in *Wandel*, the Appellate Division concluded that the plaintiff's allegations that three out of ten directors had received "backdated options and must therefore be treated as interested" were insufficiently particularized, in light of the absence of any allegations that the other seven directors were similarly interested. *Id.* at 104–05. Here, Plaintiffs' Amended Complaint is devoid of any particularized allegations as to who specifically received the luxury gifts and "substantial emoluments." To the contrary, the amended complaint "provides neither the names nor . . . the number of [members] who allegedly" received these gifts and emoluments. *Ash v. Alexander*, No. 99 Civ. 3820, 2000 WL 20704, at *2 (S.D.N.Y. Jan. 12, 2000). "In the absence of some more meaningful specificity, neither Rule 23.1 nor the 'futility' exception is satisfied." *Id.*; *see also Teamsters Allied Benefit Funds v. McGraw*, No. 09

9

Civ. 140, 2010 WL 882883, at *7 (S.D.N.Y. Mar. 11, 2010) ("The Complaint does not plead any 'particularized allegations of bias or self-interest' . . . and is therefore insufficient.").[6]

### b. Failure to self-inform

Plaintiffs argue, in the alternative, that the "Executive Board Members failed to inform themselves to a degree reasonably necessary about the PPVA transactions," and instead "merely rubber-stamped Seabrook's investment decisions." (Dkt. No. 155 at 20.) They rely on *In re Comverse Tech, Inc.*, in which the plaintiffs challenged the board's issuance of illegally backdated stock options. 866 N.Y.S.2d 10 (App. Div. 1st Dep't 2008).

The plaintiffs in *Comverse* adequately alleged demand futility based on the board's failure to "inform[] themselves to a reasonable degree about the dates assigned to company stock option grants," and its "approving backdated option grants without reviewing or taking any note of the date on which they were ostensibly awarded or to whom the options were given." *Id.* at 16. Among the particularized allegations in that case were plaintiffs' claims that "'unanimous written consents' for grants of stock options were sometimes presented to the compensation committee for signature more than a month after the grant date, in circumstances where the stock price had risen dramatically in the intervening period, and yet were approved unquestioningly." *Id.* Moreover, "the compensation committee members often approved option grants orally, in

---

[6] Plaintiffs' argument that Seabrook exerted control over the Executive Board through "implicit threats" fares no better: the mere fact that Seabrook "ha[d] the power to make decisions . . . affect[ing] their livelihood" is not by itself sufficient to meet the heightened pleading standard applicable to demand futility allegations. (Dkt 155 at 19.) Plaintiffs fail to adequately allege a single specific threat, implied or otherwise, against the members of the Executive Board.

The Court also rejects Plaintiffs' contention that the Union's advancement of Seabrook's legal fees for his criminal defense supports their claims of demand futility. As the Court previously explained, it is likely that the Executive Board was legally entitled to advance Seabrook's fees under the N-PCL § 723(c), which applies to COBA as a nonprofit organization. (Dkt. No. 141 at 24.)

direct violation of the company's bylaws." *Id.* The compensation committee in *Comverse* also possessed a list of over "two dozen" individuals who were not even company employees, yet received grants totaling 250,000 options that were placed in a "in a 'slush fund' for later use." *Id.* Nonetheless, the committee made no investigation; they did not even cross-check the list of individuals against the company's payroll. *Id.*; *see also In re Bank of N.Y. Derivative Litig.*, No. 99 Civ. 9977, 99 Civ. 10616, 2000 WL 1708173, at *2 (S.D.N.Y. Nov. 14, 2000) (holding that demand futility was established where at "least eleven of the individual defendants" allegedly "ignored the clear risks of doing substantial wire transfer and other similar business with Russian correspondent banks, failed to adopt reasonable internal controls and independent monitoring systems over the Bank's wire transfer business, and ignored repeated specific warnings that the Bank's system of internal controls over its wire transfer business was a sham and that the Bank was aiding or participating in its customers' illegal banking activity," as well as "numerous specific examples of publicly available and other information" that should have alerted them to high risk exposure (alterations omitted)).

In contrast, Plaintiff's allegations of demand futility here are far less specific and particularized. *Cf. Wandel*, 871 N.Y.S.2d at 105 ("[T]he amended complaint fails to plead with the requisite particularity that the directors had specific information or reason to inform themselves about the details of the issuance of stock options, and failed to do so."). Their allegations of "rubber-stamping" rest entirely on the criminal complaint against Seabrook, which alleges that "the other board members deferred to [Seabrook's] decision" to invest the Annuity Fund in PPVA and that "the investment decision was made by SEABROOK alone." (Dkt. No. 155 at 20–21.) In contrast to the pleading in *Comverse*, the amended complaint here fails to allege with any particularity "what the board members should have considered or investigated to

11

properly inform themselves about the challenged transactions." *Goldstein v. Bass*, 31 N.Y.S.3d 15, 17 (App. Div. 1st Dep't 2016). In fact, the Amended Complaint alleges that Koehler & Isaacs "conducted due diligence on PPVA," and although the law firm concluded that the investment "was high risk," the firm did not share that conclusion with the Executive Board. (FAC ¶¶ 108–09, 112.) In other words, "the allegations that the directors failed to inform themselves fully about the transactions and merely rubber-stamped them are wholly conclusory." *Goldstein*, 31 N.Y.S.3d at 17.[7]

Because Plaintiffs have not adequately pleaded demand futility, their failure to make a pre-suit demand on the Board leaves them without standing to bring this suit under Rule 23.1.[8]

---

[7] In their Amended Complaint, Plaintiffs also maintain that the Executive Board "waived any affirmative defense regarding demand futility by failing to raise it in their first responsive pleading." (FAC at 22–23.) For several reasons, the Court rejects this waiver argument. First, Koehler & Isaacs raised the issue of demand futility in its first motion to dismiss. (Dkt. No. 124 at 11; Dkt. No. 81 at 8.) "[T]he weight of case law supports the standing of third parties," such as Koehler & Isaacs, "to seek dismissal based on a plaintiff's failure to sufficiently plead demand under Rule 23.1." *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 408 n.7 (S.D.N.Y. 2007) (quoting *Lou v. Belzberg,* 728 F. Supp. 1010, 1019 (S.D.N.Y. 1990)). Second, the Executive Board Defendants' failure to raise demand futility in their first motion to dismiss does not bar them from raising that argument now. In fact, "FRCP 23.1 itself makes no mention that the demand requirement be resolved *before trial*." *McCoy v. Kazi*, 08 Civ. 7244, 2010 WL 11465179, at *17 (C.D. Cal. Aug. 27, 2010) (emphasis added). Accordingly, courts have permitted defendants to raise a demand defense for the first time even as late as trial. *Id.* (citing *Renz by Renz v. Carota*, No. 87 Civ. 487, 1991 WL 165677, at *2 (N.D.N.Y. Aug. 26, 1991), *aff'd sub nom. Renz v. Beeman*, 963 F.2d 1521 (2d Cir. 1992)). The Court thus concludes that Defendants have not waived their demand defense.

[8] Plaintiffs' failure to make a demand is similarly fatal to Count VIII, their sole direct claim, which seeks an equitable accounting from the Executive Board Defendants. Under New York law, there are four elements to a claim for equitable accounting: "(1) a fiduciary relationship (2) entrustment of money or property (3) no other remedy and (4) a demand and refusal of an accounting." *In re Guardianship of Kent*, 729 N.Y.S.2d 352, 353 (N.Y. Sup. Ct. 2001); *see also Kaufman v. Cohen*, 760 N.Y.S.2d 157, 168 (App. Div. 1st Dep't 2003) ("[A] court of equity will not intervene to vindicate a partner's right to an accounting in the absence of a showing that a demand for one was made and rejected by the partner in possession of the books, records, profits or other assets of the partnership."). Thus, Plaintiffs' failure to make a pre-suit demand requires dismissal of their claim for equitable accounting as well.

## 2. Standing Under Section 623(a) of New York Not-for-Profit Corporation Law

Plaintiffs lack standing to sue derivatively for an additional, independent reason: they have failed to adequately plead that they represent "five percent or more" of COBA's membership, as required by Section 623(a) of New York's Not-for-Profit Corporation Law ("N-PCL"). Where a derivative plaintiff does not represent at least five percent of the members of the not-for-profit corporation in question, the action must be dismissed. *See Pall v. McKenzie Homeowners' Ass'n, Inc.*, 995 N.Y.S.2d 400, 402 (App. Div. 3d Dep't 2014).

Plaintiffs do not dispute that they have failed to adequately allege the five percent requirement of the N-PCL. Instead, they argue that they have standing to pursue their derivative claims under Section 725 of New York's Labor and Management Improper Practices Act ("LMIPA"), which provides:

> *Any member* of [a] labor organization shall have the right to bring such action or proceeding [for violation of fiduciary duty under §§ 722 or 723] if (a) after request by any member that such action or proceeding be brought, such organization shall fail to do so, or (b) such request would be futile, or (c) such organization has failed to prosecute diligently any such action or proceeding which it has brought.

N.Y. Lab. Law § 725(1) (emphasis added). Where, as here, a labor union is organized as a not-for-profit, the derivative standing provisions of the N-PCL and LMIPA seemingly conflict: the former requires a plaintiff to represent five percent of the membership, and the latter permits "any member" to bring a suit on behalf of the union for breach of fiduciary duty.

Plaintiffs offer several arguments as to why the LMIPA's "any member" standing provision should take precedence over the N-PCL's five-percent standing requirement. First, they argue that the LMIPA is more specific, because it applies to a narrower class of organizations (labor organizations), in contrast to the N-PCL, which "applies to a plethora of

entities including . . . those with charitable, educational, religious, scientific, literary and cultural purposes." (Dkt. No. 155 at 10.) Second, Plaintiffs offer a number of "public policy" reasons why the LMIPA should trump the N-PCL under the circumstances of this case, including their concern that satisfying the N-PCL's five-percent requirement would be a "near impossibility" for unions of COBA's size.[9] (Dkt. No. 155 at 13.)

The Court need not consider Plaintiffs' arguments about statutory specificity and policy consequences, however, because the New York Appellate Division has already held that the N-PCL's standing requirement should apply in cases involving unions incorporated as not-for-profits. *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."); *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994) ("Where there is no decision by the state's highest court then federal authorities must apply what they find to be the state law after giving proper regard to relevant rulings of other courts of the State." (quoting *Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465 (1967)) (internal quotation marks and alterations omitted)). In *Clark v. Trois*, the state appellate court dismissed a derivative action against current and former officers of the Rockland County Patrolmen's Benevolent Association ("RCPBA") because the complaint failed to allege that "the plaintiff

---

[9] Notably, the parties agree that "[m]ost unions do not incorporate but remain unincorporated associations." (Dkt. No. 155 at 14 n.14; Dkt. No. 122 at 6.) This fact casts doubt on Plaintiffs' contention that it would have "significant and far-reaching implications" for unions if the Court were to apply N-PCL's standing requirement in this case. (Dkt. No. 155 at 13.)

14

represent[ed] at least five percent of the membership of the RCPBA." 801 N.Y.S.2d 330, 331 (App. Div. 2d Dep't 2005).

Plaintiffs fail to cite any "persuasive data" that the New York Court of Appeals would reach a different result in a case such as this one. First, Plaintiffs argue that *Clark* should be disregarded because the *pro se* plaintiff in that case raised a LMIPA argument for the first time on appeal. (Dkt. No. 155 at 15–16.) However, the Appellate Division applied the N-PCL—rather than the LMIPA—to the RCPBA without discussing waiver. Second, Plaintiffs contend that their "feasibility concerns" regarding N-PCL's standing requirement as applied to labor unions were not present in *Clark* because the RCPBA is a much smaller union than COBA. (Dkt. No. 155 at 16.) It is not clear, however, why the size of the union should make a legal difference in determining whether LMIPA or N-PCL governs, given that neither statute makes any reference to the size of the organization in its respective standing provisions.

Because Plaintiffs have failed to adequately plead that they satisfy N-PCL's standing requirements, their derivative claims must be dismissed for this reason as well.[10]

### III. Motions for Sanctions

#### A. Legal Standard

Federal Rule of Civil Procedure 11 provides in relevant part:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

---

[10] Moreover, even if the LMIPA rather than the N-PCL governs standing in this case, the derivative claims still must be dismissed because LMIPA § 725(1) contains a demand requirement. As explained above, Plaintiffs failed to make a demand on the Executive Board and did not establish that any such demand would be futile.

15

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; [and]
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law[.]

*Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 166 (2d Cir. 1999) (alternations in original) (quoting Fed. R. Civ. P. 11(b)). Rule 11(b)(2) "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." *Id.* (quoting Fed. R. Civ. P. 11, advisory committee note to 1993 amendments) (internal quotation marks omitted). "[T]he extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys should certainly be taken into account in determining whether paragraph (2) has been violated." *Id.* (quoting Fed. R. Civ. P. 11, advisory committee note to 1993 amendments). "Although arguments for a change of law are not required to be specifically so identified, a contention that is so identified should be viewed with greater tolerance under the rule." *Id.* (quoting Fed. R. Civ. P. 11, advisory committee note to 1993 amendments). "[T]o constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Id.* (quoting *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990)).

### B. Executive Board Defendants' Motion for Sanctions

First, the Executive Board Defendants contend that Plaintiffs' motion for a preliminary injunction (Dkt. No. 101) was sanctionably frivolous. (Dkt. No. 120 at 7–8.) Although the Court ultimately denied the Plaintiffs' motion for a preliminary injunction, it nonetheless

concludes that the motion was not frivolous. Plaintiffs' argument that Seabrook, who stood accused of breaching his fiduciary duties to COBA as part of a criminal conspiracy, was not entitled to have COBA advance his legal fees, was not obviously foreclosed by any binding precedents. *See Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 830–31 (2d Cir. 1992) (holding that "in the absence of controlling authority to the contrary," a party's argument "for extension or modification of existing law" was made in good faith and therefore not sanctionable).[11]

Second, the Executive Board Defendants claim that Plaintiffs should be sanctioned for arguing that Defendants waived their Rule 23.1 demand defense. *See* note 7, *supra*. Again, although the Court rejected Plaintiffs' waiver argument, it was not wholly unsupported and therefore was not sanctionably frivolous. Even in their motion for sanctions, the Executive Board Defendants concede that the "underlying legal proposition" that Rule 23.1 defenses are "treated procedurally as . . . Rule 12(b)(6) defenses" "has some traction" (Dkt. No. 120 at 10), and finds support in at least one case (albeit in dicta). *See Burghart v. Landau*, 821 F. Supp. 173, 179 (S.D.N.Y. 1993), *aff'd*, 9 F.3d 1538 (2d Cir. 1993) ("[I]t is noted that a rule 23.1 defense is usually pleaded or waived like a rule 12(b)(6) defense.").

Because neither of Plaintiffs' legal arguments was frivolous, Defendants' motion for sanctions is denied.

### C. Plaintiff's Motion for Sanctions

Plaintiffs argue that the Executive Board Defendants' motion for sanctions was itself "frivolous and unsupported." (Dkt. No. 144 at 2.) Thus, Plaintiffs move for sanctions as well.

---

[11] Contrary to Defendants' contention, Plaintiffs' omission of footnote one from their quotation of *United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 732 F. Supp. 434, 437 (S.D.N.Y. 1990), in their motion for preliminary injunction is not in and of itself sanctionable or indicative of bad faith.

17

"Although the filing of a motion for sanctions is itself subject to the requirements of [Rule 11] and can lead to sanctions, sanctions are infrequently granted where the motion was not clearly frivolous, filed for an improper purpose, or not well grounded in fact or law." *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10 Civ. 128, 2013 WL 1775373, at *3 (S.D.N.Y. Apr. 25, 2013) (quoting *Goldberg v. Blue Ridge Farms, Inc.*, No. 10 Civ. 1371, 2005 WL 1796116, at *7 (E.D.N.Y. July 26, 2005)).

With the hope of cutting off the apparently fractal nature of the parties' recursive approach to sanctions motions, Plaintiffs motion is also denied.

First, contrary to Plaintiffs' contentions, the Executive Board Defendants did not seek sanctions based on Plaintiffs' inclusion of a claim under the Labor-Management Reporting and Disclosure Act of 1959 in the original complaint. (*See* Dkt. No. 120 at 7–10 (listing only two grounds for Defendants' sanctions motion: (1) the motion for preliminary injunction; and (2) the waiver argument).) The same goes for Plaintiffs' discussion of their request for a Rule 16 conference (*see* Dkt. No. 144 at 5): Defendants did not seek sanctions on this basis.

Third, in light of the Court's rulings in this Order and its previous ruling on the motion for preliminary injunction, Plaintiffs' contentions that their preliminary injunction motion and waiver argument are both "meritorious" is simply incorrect. Their motion for sanctions, like that of their opponents, is therefore denied.

## IV. Conclusion

For the foregoing reasons, the respective motions to dismiss of the Executive Board Defendants, Koehler & Isaacs, and Rechnitz are GRANTED. All other motions to dismiss are DENIED as moot. All motions for sanctions are DENIED.

Defendant Rechnitz's motion to delete Docket Entries 162 and 164 is DENIED as moot.

The Clerk of Court is directed to close the motions at Docket Numbers 80, 83, 85, 119, 121, 123, 127, 143, and 166.

SO ORDERED.

Dated: December 15, 2017
New York, New York

_____
J. PAUL OETKEN
United States District Judge